## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KENNETH KLIPPENSTEIN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.  1:23-cv-01083 (TSC) |
| | * | |
| NATIONAL ARCHIVES AND RECORDS | * | |
| ADMINISTRATION, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

On 20 June 2023, Defendants National Archives and Records Administration and Colleen Shogan (collectively "NARA") filed a consolidated motion to dismiss this case and motion to consolidate this case with the related case *Citizens for Responsibility and Ethics in Washington v. DHS*, No. 22-3350 (D.D.C.) ("*CREW/DHS*"). Because these two motions are legally and procedurally distinct and responding to them together would create a disjointed and hard-to-read brief, Plaintiff Kenneth Klippenstein ("Klippenstein") responded to the motion to consolidate separately on 8 August 2023, and he now responds to the motion to dismiss.

However, in recognition of the fact that at least part of this case is identical to *CREW/DHS*, Klippenstein will endeavor to avoid duplicating arguments made by the plaintiff in that case, although he will add arguments which were not made by CREW in opposition to NARA's motion to dismiss, even if they could have been raised. While Klippenstein opposes full consolidation of the two cases, he stipulates that the Court would have good reason to issue a single opinion regarding NARA's pending motions to dismiss before proceeding to treat the two

cases separately. As such, in the interest of judicial economy and in recognition of the fact that the two cases have been designated as related pursuant to Local Rule 40.5(a)(3), Klippenstein incorporates and will not repeat CREW's arguments which apply to both cases, and he respectfully encourages the Court to similarly apply any arguments that *he* makes which are relevant to *CREW/DHS* in that case as well, so as to avoid any potential tension between the holdings.

## ARGUMENT

NARA's Motion falls short of the mark in four primary ways, which Klippenstein will address in roughly the order in which NARA makes the arguments: (1) NARA's argument that Klippenstein's injury is not redressable is based on an unreasonably narrow interpretation of the options available to the Attorney General and Department of Justice (collectively "DOJ") and the opinions of officials who lack the necessary expertise to competently testify about the matter, as well as not addressing all the records in question; (2) this unreasonably narrow interpretation of DOJ's options similarly pervades NARA's argument that the Federal Records Act's ("FRA") enforcement authority does not apply to the destruction of records; (3) NARA's argument that Klippenstein failed to overcome the presumption of agency regularity completely ignores the facts of the case and relies on inadmissible evidence; and (4) it is premature to adjudicate the merits of Klippenstein's mandamus claims at this time.

## I.   STANDARD OF REVIEW

Klippenstein largely accepts NARA's recitation of the applicable standard of review (Defs.' Mem. P. & A. Supp. Mot. Dismiss or Consol., Dkt. #9-1, at 4-5 (filed June 20, 2023) [hereinafter NARA's Mem.].) He will only emphasize that while the Court may consider additional evidence besides the Complaint when adjudicating a motion to dismiss for lack of

subject matter jurisdiction under Federal Rule of Civil Procedure ("FRCP") 12(b)(1), it may *not* do so when adjudicating a motion to dismiss for failure to state a claim under FRCP 12(b)(6) unless that evidence is attached to or incorporated into the complaint or is a matter of which the Court may take judicial notice. This distinction is critical in this case because the declarations offered by NARA can only be considered in the context of its redressability argument and may not be considered outside of that argument.

## II.     NARA FAILS TO SHOW THAT THE INJURY IS NOT REDRESSABLE

At the very beginning of its brief, NARA makes a critical mischaracterization that the Court must uncritically accept as true in order to rule in its favor on the two primary issues in controversy. NARA's first sentence reads: "Kenneth Klippenstein seeks to compel [NARA] to request that the Attorney General *initiate an enforcement action* under the Federal Records Act to recover certain allegedly missing federal records." (*Id.* at 1 (emphasis added).) The Court must accept this statement as true in order to find that NARA has demonstrated that Klippenstein's injury is not redressable, as well as to find that NARA is not required to request the Attorney General's assistance in matters involving the destruction of records. Unfortunately for NARA, Klippenstein's Complaint was not so limited: "Klippenstein is therefore entitled to relief in the form of . . . an injunction compelling the Archivist pursuant to [44 U.S.C. § 2905] to request that the Attorney General initiate action *or seek other legal redress* to recover any deleted text messages." (Compl., Dkt. #1, ¶ 43 (filed Apr. 19, 2023) (emphasis added).) That "other legal redress" alternative dooms NARA's arguments.

NARA's argument that Klippenstein's claims are not redressable is entirely based on the allegation that "they concern potential federal records that are either already in agency custody or, if they ever existed, are no longer recoverable." (NARA's Mem. at 6.) While Klippenstein

agrees that, to the extent that DHS has already recovered text messages, those messages would be beyond the scope of this case, the alternative rationale that they are no longer recoverable fares significantly more poorly. Relying on declarations written for *CREW/DHS*, NARA describes two ways in which DHS attempted to recover some of the deleted text messages: attempting to retrieve them "from either [each] device itself or from the service providers." (*Id.* at 8.) Those two efforts constitute the totality of DHS's recovery efforts; the agency did not even attempt to recover the messages "from the relevant custodian[s] personally." (*Id.*)

As an initial matter, even assuming *arguendo* that these efforts were sufficient, they did not even address the full scope of NARA's investigation, let alone Klippenstein's Complaint. NARA directed DHS to "identify and report to NARA whether *any* government phones and/or accounts that were maintained by DHS lost text messages or any other records as part of the mobile phone migration process" and requested that DHS "focus on the devices and accounts of senior leaders of DHS." Ltr. from Brewer to Thomas of 8/1/22 at 1, *available at* https://www.archives.gov/files/records-mgmt/resources/ud-2022-0055-dhs-open-letter.pdf (last accessed Aug. 8, 2023) (emphasis added). NARA did not direct DHS to look into the government phones and accounts *of Chad Wolf ("Wolf") and Ken Cuccinelli ("Cuccinelli")*; it directed DHS to identify *any* government phones and/or accounts which lost text messages. It did not even specify Wolf and Cuccinelli as the "senior leaders of DHS" on whose devices DHS should focus; it just asked DHS to focus on "the senior leaders." As for Klippenstein's Complaint, it sweeps even broader than NARA's investigation, also including phones which were "otherwise materially altered" in addition to those which underwent a reset or migration.[1]

---

[1] This analysis assumes *arguendo* that "migrated, transitioned, [or] replaced," *id.*, do not possess significantly different definitions than "reset." Klippenstein will accept this assumption for the purposes of this dispute, although he reserves the right to make that argument in another context.

(Compl. ¶ 32.) Despite these two directives of broad scope, NARA's declarants discuss efforts to recover the text messages of only three officials (not including the Secret Service personnel covered by NARA's first investigation and Klippenstein's first request).[2] Accordingly, even if the Court were to hold that Klippenstein's claims are not redressable insofar as the texts lost from the Secret Service's, Wolf's, and Cuccinelli's phones are concerned, it could not dismiss this case in its entirety.

Even regarding those specific records, however, NARA has not shown that the lost text messages are not recoverable, because DHS (including the Secret Service) did not or could not avail itself of all of the options available to DOJ. The Secret Service attempted to recover text messages from the devices which were reset during the Intune migration, then asked Verizon to recover those messages. (NARA's Mem. at 8-9.) DHS attempted to recover text messages which were synced to Wolf's and Cuccinelli's iCloud accounts, then asked AT&T and Verizon to recover messages from January 2021.[3] (NARA's Mem. at 9-10.) Neither agency attempted to recover the messages from the third parties with whom they were exchanged, which would be well within DOJ's capabilities but arguably beyond DHS's legal authorities.[4] Neither agency

---

[2] Part of this discrepancy can be explained by the fact that NARA made the unconventional choice to reuse declarations written for *CREW/DHS* instead of providing new, potentially more appropriate declarations written specifically in response to Klippenstein's claims. However, this would not explain why DHS's recovery efforts did not cover the entire scope of NARA's investigation, nor why NARA has apparently seen fit to bless DHS's patently incomplete efforts, further demonstrating the need for this litigation.

[3] The fact that DHS only requested recovery of messages from January 2021 further establishes the degree to which DHS's actions did not cover the full scope of this case, since Klippenstein used the time frame from November 2020 until April 2021. (Compl. ¶ 32.)

[4] This is additionally inexplicable since one of the declarants states that DHS obtained non-content text messaging details from AT&T regarding Wolf which revealed that "Wolf sent/received several text messages on his regularly issued electronic cellular device" (Granger Decl., Dkt. #9-4, ¶ 25 (filed June 20, 2023)), yet never attempted to then obtain copies of the deleted text messages from the third parties. If this was a deliberate choice, then DHS refused to

used the wide panoply of forensic technical tools that the Federal Bureau of Investigation regularly uses to recover data from phones which have been reset. These are but two obvious examples of "other legal redress" which DOJ could bring to bear on the issue but which appear to be beyond the capabilities of the Secret Service and DHS, and it is facile for NARA to argue that the Court lacks subject matter jurisdiction because declarants who are not competent to testify about DOJ's technical and legal capabilities—since they are not employed by DOJ—have stated their opinion that the text messages in question are "fatally lost." (NARA's Mem. at 8.)

If the Court remains concerned that Klippenstein's claims may not be redressable, it should authorize limited discovery to ascertain the relevant facts and support or refute the redressability of his claims. The Court could also hold a preliminary hearing to adduce relevant evidence.

If the Court wishes to order formal written discovery or deposition testimony, FRCP 26(b)(1) states: "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P 26(b)(1). If the Court simply wishes to allow examination of one or more government officials, FRCP 12(i) allows a Court to use a preliminary hearing "to determine jurisdictional as well as other threshold issues." *Kregler v. City of N.Y.*, 608 F. Supp. 2d 465, 475 (S.D.N.Y. 2009). As explained in *Kregler*:

> [A]cknowledging that this case presents a close call, to minimize additional motion practice at this stage and avert potentially unnecessary extensive discovery, the Court proposes two steps intended to achieve the "amplication" of factual allegations by means of a "flesh[ing] out" procedure such as that suggested in *Iqbal*. 490 F.3d at 158. First, the Court will exercise its discretion pursuant to Rule 12(i) to schedule a preliminary hearing at which the parties may present the testimony of live witnesses and other evidence limited to Defendants' objections to the pleadings . . . . As regards matters involving factual issues that

---

take the necessary steps to recover the lost records, and the Archivist would be required to seek the Attorney General's assistance. If this was because DHS lacked the legal authority to obtain those text messages from third parties, then the Archivist would also be required to seek the Attorney General's assistance. Either way, the result is the same.

> bear on the subject of the hearing the Court may consider affidavits, depositions
> or documents, or testimony presented orally.

*Id. See also Rivera-Gomez v. de Castro*, 900 F.2d 1, 2 (1st Cir. 1990) (noting that Rule 12(i) "can be an excellent device for conserving time, expense, and scarce judicial resources by targeting early resolution of threshold issues"). Such a procedure would allow the undersigned to question one or more government officials under oath in the Court's presence, which would ideally adduce the information the Court will need to make its ruling.

Regardless of which approach the Court selects, NARA's failure to proffer definitive evidence on the issue of redressability, coupled with the fact that the relevant evidence on this issue rests solely with the Government, means that Klippenstein should be given the opportunity to obtain and adduce relevant evidence without imposing an onerous discovery burden on the Government. This is especially appropriate since the evidence sought would be limited to information about the scope of DHS's recovery efforts and the possible alternative means at DOJ's disposal for the recovery of text messages.

Discovery on these topics can be accomplished in part through the use of interrogatories, document requests, and requests for admissions. In the final analysis, however, Klippenstein would likely need to conduct targeted depositions of one or more individuals who can speak to these matters. Documents, while certainly useful, are unlikely by themselves to address the matter sufficiently thoroughly for the Court's purposes.

## III. THE FRA'S ENFORCEMENT AUTHORITY APPLIES TO DESTRUCTION

NARA's argument that the FRA's enforcement duty only applies when records have been removed from agency custody, and not when records have been destroyed, is based virtually entirely on case law analyzing the wrong part of the FRA, and another court rejected this identical argument in a similar case less than a month ago. Rather than reinvent the wheel or use

a lengthy block quotation from that case, Klippenstein will simply reproduce the relevant analysis below with necessary contextual modifications, with the acknowledgement that it is copied from the opinion found at *Mary Ferrell Found., Inc. v. Biden*, No. 22-6176, 2023 U.S. Dist. LEXIS 121633, *23-26 (N.D. Cal. July 14, 2023).

NARA argues this case should be dismissed because a referral to the Attorney General is only required under 44 U.S.C. § 2905(a) for the recovery of records unlawfully *removed*, rather than *destroyed*. NARA cites a case interpreting an analogous provision to § 2905(a)—44 U.S.C. § 3106(a), which governs federal agencies—holding that agencies only have a duty to involve the Attorney General when records have been unlawfully removed. *See CREW v. SEC*, 916 F. Supp. 2d 141, 147-49 (D.D.C. 2013).

However, NARA fails to contend with the differences in language between § 2905(a) and § 3106(a). While § 3106(a) only requires an agency head to "initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed," § 2905(a) requires the Archivist to assist an agency head in "initiating action through the Attorney General for the recovery of records unlawfully removed *and for other redress provided by law*." 44 U.S.C. §§ 2905(a), 3106(a) (emphasis added). Likewise, if the agency head fails to "initiate an action for such recovery or other redress" after being notified of "*any such unlawful action*," the Archivist must request the Attorney General to initiate such action. 44 U.S.C. § 2905(a) (emphasis added). In other words, as compared with § 3106(a), § 2905(a) includes an additional clause enabling the Archivist to initiate action through the Attorney General. § 2905(a) thereby seems to impose a broader referral duty on the Archivist than § 3106(a) imposes on agency heads because of its inclusion of "other redress provided by law." Such a distinction also seems to be made within § 3106.

*Compare* 44 U.S.C. § 3106(a) (requiring agency heads to take action for "the recovery of records . . . unlawfully removed") *with* § 3106(b) (requiring the Archivist to make a referral when an agency head fails to "initiate an action for such recovery or other redress" after notification of "any such unlawful action described in subsection (a)").

The legislative history of § 2905 and § 3106 supports this interpretation. In 1984, Congress amended § 2905 and § 3106 to require an Attorney General referral by the Archivist if an agency head failed to take action. The House committee report only discusses the provision in the context of initiating action for the "recovery of records unlawfully removed." H.R. Rep. 98-707, at 21. By contrast, the final conference report explained the provision as requiring the Archivist to make a referral to the Attorney General if they are aware of "any such unlawful action," where "destruction" was listed several sentences before as one action prohibited by law. H.R. Conf. Rep. 98-1124, at 27, *as reprinted in* 1984 U.S.C.C.A.N. 3894, 3902. The conference report then explained that Congress would be notified in such instances "because of the frequency of incidents of removal *or destruction*." *Id.* at 28 (emphasis added).[5]

Because the language of § 2905(a) and § 3106(a) are markedly different, NARA's references to a case interpreting § 3106(a) are not persuasive. § 3106(a) seems to require the Archivist to make an Attorney General referral in more circumstances than unlawful removal of records. It instead seems to require that the Archivist make a referral to the Attorney General if the agency head has failed to act and the Archivist is aware of, among other unlawful conduct, destruction of agency records.[6]

In light of this analysis, it is clear where NARA's initial mischaracterization of this case comes into play. If the Court accepts that Klippenstein only asks the Court to compel NARA to

---

[5] The conference report adopted the House version of § 2905, so no legislative text changed between the committee report and the conference report.

request that the Attorney General "initiate an enforcement action" under the FRA (NARA's Mem. at 1), then the Court need not concern itself with the possibilities of other avenues of legal redress. However, as shown above, DOJ possesses several possible alternative methods for recovering these text messages—some technical and some legal—and that distinction squarely demonstrates that this Court should follow Judge Seeborg's lead. Moreover, the availability of these alternatives undercuts NARA's argument that Klippenstein is necessarily asking the Court to compel the initiation of an intra-branch dispute between DOJ and DHS. (*Id.* at 13-14.) While Klippenstein does not accept NARA's premise that DOJ would be constitutionally incapable of enforcing the FRA against DHS officials in court, the fact that numerous options for data recovery exist which do *not* require intra-branch litigation distinguishes this case from those cited by NARA. Even if the Court were to completely accept NARA's reasoning regarding the undesirability of "judicial resolution of intra-Executive disputes . . . under both Article II and Article III," *SEC v. FLRA*, 568 F.3d 990, 997 (D.C. Cir. 2009) (Kavanaugh, J., concurring), that would not put an end to this case; at most it would limit what the Attorney General could do once the matter was referred to him by the Archivist.

## IV.    THE PRESUMPTION OF REGULARITY DOES NOT MEANINGFULLY APPLY

The presumption of regularity on which NARA relies can be triggered by evidence or by law; if the law imposes a duty on an official, it is presumed that the official has properly performed that duty, unless there is evidence to the contrary. However, the presumption is not absolute; courts have routinely refused to impose the presumption where "irregularity plainly appears from the record" and courts have required the Government to "disprove the appearance of irregularity." *Romero v. Tran*, 33 Vet. App. 252, 260-61 (2021). At the motion to dismiss

---

[6] This is the end of the discussion in *Mary Ferrell Foundation*.

stage, NARA even concedes that Klippenstein need only raise "specific allegations" to overcome
this presumption. (NARA's Mem. at 15.) Klippenstein has clearly done so:

- "[I]n January 2021, text messages were lost in a 'reset' of the government phones
  used by Acting Secretary of Homeland Security Chad Wolf and Acting Deputy
  Secretary of Homeland Security Ken Cuccinelli." (Compl. ¶ 9.)

- "In May 2021, the Secret Service informed Cuffari that an unknown number of
  text messages from 5-6 January 2021 were erased during the Intune migration."
  (*Id.* ¶ 12.)

- "Metadata shows that ten of the twenty-four [Secret Service] personnel sent or
  received text messages which were not retained." (*Id.* ¶ 13.)

- "On 14 July 2022, Cuffari first informed the House and Senate Committees on
  Homeland Security that 'many US Secret Service text messages from January 5
  and 6, 2021, were erased as part of a device replacement program.'" (*Id.* ¶ 19.)

- "On 20 July 2022, DHS OIG . . . opened a criminal investigation" into the
  deletion of the Secret Service text messages. (*Id.* ¶ 20.)

- "In or about March 2023, the Integrity Committee of the Council of Inspectors
  General for Integrity and Efficiency ("CIGIE") informed Cuffari and his Chief of
  Staff Kristen Fredricks . . . that it was investigating DHS OIG regarding the
  deletion of text messages.'" (*Id.* ¶ 21.)

- "On 19 July 2022, NARA sent a letter to the Secret Service Agency Records
  Officer regarding the Secret Service text messages." (*Id.* ¶ 24.)

- "[T]he DHS Office of the Inspector General knew about [the DHS] records
  destruction for months without notifying anyone." (*Id.* ¶ 31.)

- "On 1 August 2022, NARA sent a letter to the DHS Department Records Officer regarding the widespread deletion of text messages." (*Id.* ¶ 33.)

Given that Klippenstein's source of information regarding the improper destruction of text messages has consistently been determinations made by government agencies, these allegations are far from the "pure speculation" NARA describes them as. (NARA's Mem. at 15.) NARA's allegation that the "complaint makes no specific allegations that any custodian failed to follow applicable records preservation requirements" (*id.*) is either entirely frivolous or represents an unspoken implication that Klippenstein must identify *specific* custodians who acted improperly, which would greatly exceed his necessary burden of proof at the motion to dismiss stage.

Furthermore, it is telling that NARA extols the virtues of the presumption of agency regularity, yet applies it to only one agency: DHS. If DHS personnel are entitled to a presumption that they "properly discharged their duties," *Bracy v. Gramley*, 520 U.S. 899, 909 (1997), by "'forward[ing] work-related correspondence' to their official email accounts" (NARA's Mem. at 15 (quoting *Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy*, 241 F. Supp. 3d 14, 21 (D.D.C. 2017))), then it follows logically that Secret Service personnel are entitled to a presumption that they properly discharged their duties by informing the DHS OIG that text messages were erased during the Intune migration and could not be located. It follows logically that DHS OIG personnel are entitled to a presumption that they properly discharged their duties by opening a criminal case into the destruction of records—which appears to still be underway. It follows logically that NARA personnel are entitled to a presumption that they properly discharged their duties by opening investigations into the destruction of records—which appear to still be underway. It follows logically that CIGIE personnel are entitled to a presumption that they properly discharged their duties by opening an investigation into DHS

OIG regarding the destruction of records—which appears to still be underway. At a certain point, the Court must find that the presumption of regularity afforded to one set of officials is necessarily overcome by the presumption of regularity afforded to numerous other sets of officials who allege that the first set acted irregularly.

Lastly, since NARA's argument regarding the presumption of regularity is part of its motion to dismiss under FRCP 12(b)(6), the Court cannot consider the declarations as part of its analysis, which is the sole source of authority for its contention that "agency policy at Secret Service and DHS specifically required agency employees to copy text messages constituting federal records sent or received on an agency-provided phone to an official email account or other agency storage system." (*Id.*)

## V.    IT IS PREMATURE TO ADJUDICATE THE MANDAMUS CLAIM

Klippenstein concedes that Count Two is factually duplicative of Count One and simply applies the Mandamus Act instead of the APA. However, this is not a fatal flaw in and of itself. "At this stage of the case, it would be premature and inappropriate to determine whether the relief of mandamus will or will not issue. Certainly whether relief is available under the APA will be relevant to whether the mandamus relief requested will be necessary. It is sufficient to determine that plaintiffs have stated a claim for relief under the mandamus statute. Whether or not plaintiffs will prove that claim remains to be seen." *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 44 (D.D.C. 2002); *see also CREW v. Exec. Office of the President*, 587 F. Supp. 2d 48, 63 (D.D.C. 2008) (dismissing APA claims but declining to dismiss duplicative mandamus claims). For the same reasons discussed above, Klippenstein has stated a claim for relief under the Mandamus Act, and NARA does not argue that point beyond alleging that the APA provides an adequate alternative remedy. (NARA's Mem. at 16-17.)

## **CONCLUSION**

For the foregoing reasons, the Court should deny NARA's Motion and order the parties to begin discovery, limited or otherwise.

Date:   August 10, 2023

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*